# EXHIBIT "A"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
Civil Action No. 09-CV-4826

| | | |
|---|---|---|
| EARL WILLIAMS | ) | DEPOSITION UPON |
| | ) | ORAL EXAMINATION |
|    Plaintiff, | ) | |
| | ) | OF |
| -vs- | ) | |
| | ) | EARL WILLIAMS |
| CITY OF PHILADELPHIA, | ) | |
| OFFICER LAUREN OSWALD, | ) | |
| individually and in her | ) | |
| official capacity as a | ) | |
| police officer in the City | ) | |
| of Philadelphia, CITY OF | ) | |
| PHILADELPHIA, and RITE | ) | |
| AID CORPORATION, STORE | ) | |
| #2709 | ) | |
| | ) | |
|    Defendants. | ) | |

----------------------------

      TRANSCRIPT OF DEPOSITION, taken by and before MARY E. BRIEN, Registered Professional Reporter and Notary Public, at ERSA COURT REPORTERS, 30 South 17th Street, United Plaza, Suite 1520, Philadelphia, Pennsylvania, on Tuesday, March 16, 2010, commencing at 1:35 p.m.



ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA  19103
(215) 564-1233

**Page 2**

```
 1   APPEARANCES:
 2     WEISBERG LAW, P.C.
        BY: GRAHAM F. BAIRD, ESQUIRE
 3        7 South Morton Avenue
          Morton, Pennsylvania  19070
 4          Attorney for the Plaintiff
 5     BOLAN, JAHNSEN & DACEY
        BY: JOHN EVANS, ESQUIRE
 6        31 South Eagle Road
          Havertown, Pennsylvania  19083
 7          Attorney for the Defendant Rite Aid,
            Store #2709
```

**Page 3**

INDEX

| WITNESS | PAGE |
|---|---|
| EARL WILLIAMS | |
| By: MR. EVANS | 4 |

EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| (No exhibits were marked.) | | |

**Page 4**

            (By agreement of counsel, the
    signing, sealing, filing and certification
    of the transcript have been waived; and
    all objections, except as to the form of
    the question, have been reserved until the
    time of trial.)
            EARL WILLIAMS, after having been
    duly sworn, was examined and testified as
    follows:
                    - - -
    BY MR. EVANS:
        Q.   State your full name please, sir?
        A.   Earl G. Williams.
        Q.   What is your date of birth?
        A.   9/20/60.
        Q.   Where do you currently live?
        A.   1009 East Clivedon Street, Apartment 1.
        Q.   Philadelphia?
        A.   19119.
        Q.   And who, if anyone, do you live there
    with?
        A.   I live alone.
        Q.   Are you married?
        A.   Married, but separated.

**Page 5**

        Q.   Mr. Williams, my name is John Evans. In
    this case I have the privilege of representing Rite
    Aid. You are here for a deposition. Have you ever
    been deposed before?
        A.   Yes.
        Q.   How many times?
        A.   Once.
        Q.   Was it related to a personal injury
    lawsuit?
        A.   Yes.
        Q.   What were the injuries you claimed in
    this lawsuit?
        A.   I have -- what do you call it -- my knee
    got hurt. But I also was getting spinal epidurals
    in my back for pain in my back.
        Q.   Knee and back pain?
        A.   Yes.
        Q.   You didn't injure your knee or back in
    this accident, did you?
        A.   No.
        Q.   You're not really claiming any injury in
    this, are you?
        A.   No.
        Q.   But you are somewhat familiar with the

Page 6

1  procedure, correct?
2     A.  Some.
3     Q.  Who is your lawyer?
4     A.  At that particular time, James Vernile.
5     Q.  James Vernile?
6     A.  Yes.
7     Q.  How long ago did that case resolve?
8     A.  It happened December 31, 2005, and it
9  resolved approximately in '09.
10    Q.  It recently resolved?
11    A.  '09 or '08.
12    Q.  The reason I'm asking you these
13 questions is because I want to see how familiar you
14 are with the procedure today. What's going to
15 happen today is I'm going to ask you questions. My
16 questions and your answers are being taken down by
17 a court reporter, who is the woman to my left.
18 It's going to be made into a transcript. I'm going
19 to use the transcript in evaluating this case.
20         In the event that your case settles
21 or resolves, we're all going to use this transcript
22 in any subsequent trial or hearing. So it's very
23 important to get exactly what you want to say on
24 the record as accurately as possible.

Page 7

1          Number one, all of your answers
2  have to be verbal. You can't nod your head yes,
3  shake your head no. You must say yes or no. If I
4  ask you to describe something, for example, a
5  distance, you can't go about that far. You have to
6  say about three feet. The sole reason is the court
7  reporter is not allowed to take down anything that
8  you do, just what you say.
9          Do you understand that?
10    A.  No problem. Thank you.
11    Q.  Number two, only one of us can speak at
12 a time. The court reporter is very fast, but she
13 can't take down two people speaking at the same
14 time. For the same reason, if you hear two people
15 talking in a crowded room, you only pay attention
16 to one of them. So please wait until I'm done my
17 question before you answer, and I'll wait until
18 you're done your answer before I ask you another
19 question.
20         Do you understand that?
21    A.  Yes, I do.
22    Q.  Number three, if you don't understand
23 me, please ask me to repeat it or rephrase it or
24 speak up, whatever it takes. We're happy to do

Page 8

1  so. When you answer my question, I assume you
2  heard me, understood me, and gave me the answer
3  that you wanted to give. If you don't understand
4  me, don't answer. Ask me to speak up.
5          Do you understand that?
6     A.  Yes.
7     Q.  Number four, if you don't know the
8  answer to any question I ask you, I don't know is a
9  perfectly valid answer. This isn't school where
10 it's a multiple choice test and you get credit for
11 a lucky guess. We don't want you to guess. If you
12 don't know the answer, say I don't know.
13         On the same line of thought,
14 estimates are fine. No one expects you to have a
15 tape measure with you or a stop watch when this
16 happened. So estimating time or distance, that is
17 expected. Just let us know you're estimating. It
18 is going to be very natural for you to use words
19 like approximately, about, estimate. Lately I've
20 been getting the word guesstimate, which is a
21 little imprecise for our purposes. So let's try to
22 avoid that. But no guesses.
23         Do you understand that?
24    A.  Yes.

Page 9

1     Q.  Any questions before we start?
2     A.  No.
3     Q.  Do you understand my instructions?
4     A.  Yes, I do.
5     Q.  All right. Mr. Williams, I'm going to
6  initially do some background information. You were
7  born in 1960?
8     A.  Yes.
9     Q.  And how far did you go in school?
10    A.  I finished high school.
11    Q.  Where did you go to high school?
12    A.  Dreher High School, Columbia, South
13 Carolina.
14    Q.  You're from South Carolina?
15    A.  Yes.
16    Q.  What did you do after you got out of
17 high school?
18    A.  Worked.
19    Q.  Where did you work?
20    A.  My uncle has a produce business in South
21 Carolina call Jenkins Produce. So I worked with
22 him.
23    Q.  Then what did you do?
24    A.  From there, just odd jobs. Odd jobs,

**Page 10**

1 like, in the Jackson area. And I moved here in
2 '87.
3    Q. What was the purpose of your moving here
4 in 1987?
5    A. Well, in 1987 my Aunt Rose, which is my
6 father's great-aunt, she was sick. So I came back
7 to see her a couple times to take care of her. And
8 the third time I came after she passed away, I
9 stayed. I ended up living here.
10    Q. And what was the job you first started
11 working at in Philadelphia in 1987 when you decided
12 to stay?
13    A. My first job that I recall is with a
14 temporary agency at Ellsworth and Federal.
15    Q. A temp agency?
16    A. Yes.
17    Q. What kind of work were you doing?
18    A. Local work, like, you know, moving
19 boxes. It was, like, manufacturing laundry
20 detergent boxes, and we had to put them on skids
21 and take them out.
22    Q. What company?
23    A. I forgot the name of it. It's so long
24 ago.

**Page 11**

1    Q. And any time in the service?
2    A. No.
3    Q. Do you have any criminal history?
4    A. How soon? Besides what's going on here,
5 you know.
6    Q. Okay. Other than this incident, you're
7 not aware any of criminal history?
8    A. No.
9    Q. Any medication you're on today?
10    A. No.
11    Q. Any alcohol in the past 12 hours?
12    A. No.
13    Q. Any reason you cannot give truthful
14 testimony here today?
15    A. No.
16    Q. Do you have any children?
17    A. No, I do not.
18    Q. When did you get married?
19    A. 1995. My marriage broke up in 2004.
20 I'm separated now. I'm waiting for my final
21 decree.
22    Q. Your soon-to-be ex-wife is not asserting
23 any kind of claim that the marriage was damaged
24 because of this incident; is that correct?

**Page 12**

1    A. Right.
2    Q. It's just you versus me and the City,
3 correct?
4    A. Yes.
5    Q. Where were you working at the time of
6 this incident?
7    A. I work for Community College right now.
8    Q. Is that where you were working at the
9 time of the incident?
10    A. Yes.
11    Q. How long have you worked for the
12 Community College?
13    A. My anniversary date would be three years
14 after the 26th. No. Three years after to 26th of
15 February.
16    Q. You have been working there since the
17 26th of February this year?
18    A. '07.
19    Q. So you've worked there since February of
20 2007, correct?
21    A. Yes.
22    Q. And you were working there at the time
23 of this incident?
24    A. Yes.

**Page 13**

1    Q. That's the Community College of
2 Philadelphia?
3    A. Yes.
4    Q. What do you do for the Philadelphia
5 County Community College?
6    A. I am in environment services, but you
7 can call it housekeeping.
8    Q. Housekeeping?
9    A. Yes.
10    Q. Are you a member of a union?
11    A. Yes.
12    Q. What union?
13    A. Teachers.
14    Q. And how long have you been a member of
15 the teachers union?
16    A. Since approximately six months after I
17 got there.
18    Q. Have you ever been a member of a union
19 before you became a member of the teachers union,
20 any other unions in your past?
21    A. No. No. No, sir.
22    Q. Had you ever had a housekeeping job
23 before you worked for the Philadelphia County
24 Community College?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

Page 14

1  A. Yes, I have.
2  Q. Where did you work before that?
3  A. True Light Fellowship Church, which is
4  one of my churches. That's a church I was pastor
5  at for years.
6  Q. One of your churches. You said you're a
7  pastor?
8  A. Yes. I work for him.
9  Q. You work for the pastor?
10 A. Yes.
11 Q. Okay. I misunderstood you. It's called
12 True Light?
13 A. Fellowship.
14 Q. Where is it located?
15 A. 6400 Ardleigh Street, Philadelphia,
16 Pennsylvania 19119. Around the corner from my
17 house, my apartment.
18 Q. Is it a fundamentalist Christian church?
19 A. Yes. It's Pentecostal.
20 Q. All right. How long have you been a
21 member of that church?
22 A. Okay. It formed in 1995. I started
23 working for Pastor Pennock in 1997 until 2004.
24 Q. Why did you stop?

Page 15

1  A. Well, I got extremely frustrated for who
2  I was working under. And Wyeth Pharmaceuticals
3  called me for a position there that I applied for
4  doing the same type of work. I took it, because
5  the money was better.
6  Q. How long were you working at Wyeth?
7  A. Just a little bit -- maybe a year,
8  year-and-a-half before my marriage broke up.
9  Q. And why did you leave Wyeth?
10 A. Have no transportation to get there.
11 And after that, my marriage had broke up, so I
12 didn't feel that I needed to be there. I wanted to
13 work there, but I didn't feel --
14 Q. Did your wife work there?
15 A. No.
16 Q. How did you get there every day?
17 A. The 101, the high speedline, and then
18 sometimes this guy from Wyeth who worked there
19 would give me a ride in and a ride out.
20 Q. How did your transportation change that
21 caused you to have to leave Wyeth?
22 A. It changed because he said he didn't
23 want to be liable for me riding with him if I have
24 an accident and I'm not on his insurance. That's

Page 16

1  one of the reasons.
2  Q. He said he couldn't let you be a
3  passenger in his car because he doesn't want to be
4  liable because you wouldn't be on his insurance?
5  A. Yes.
6  Q. Who is this guy?
7  A. I forgot his name. It's so long. I
8  forgot his name.
9  Q. Okay. Let's go back. So you left Wyeth
10 because of transportation problems, correct?
11 A. Yes.
12 Q. And then you started working at
13 Philadelphia County Community College in February
14 2007, correct?
15 A. Yes.
16 Q. Any other jobs between when you started
17 working for PCCC and the date of the accident?
18 A. No.
19 Q. Do you remember the date of the
20 accident?
21 A. I recall April 22nd.
22 Q. I wasn't there. You have to tell me.
23 A. April 22, '08.
24 Q. April 22, 2008?

Page 17

1  A. I think it was Primary Election Day that
2  day.
3  Q. The Philadelphia Primary?
4  A. Yes, sir.
5  Q. It was kind of hectic. April 22, 2008.
6  And had you worked that day?
7  A. No.
8  Q. Was the school closed because of the
9  Primary?
10 A. No. I had took a vacation day that
11 day. But I didn't work on my job that day.
12 Q. You took a vacation day for what reason?
13 A. Well, a couple reasons. I wanted to
14 vote. And the second reason was -- which I did
15 vote before this incident took place. And the
16 other thing is me and my buddy was going to go to
17 Valley Green. And I meet up with him most of the
18 time over at the Dunkin' Donuts across from the
19 Rite Aid. But at this time, he didn't -- I told
20 him I was in Rite Aid. So I told him -- I talked
21 to him briefly before I went into Rite Aid, but
22 that's the day that I was off.
23 Q. What do you go to Valley Green for?
24 A. To run.

**Page 18**

1  Q. You're a runner. You were going to run
2  that day?
3  A. Yes.
4  Q. How often do you run in Valley Green?
5  A. Not often. Maybe when I get a chance.
6  I would say maybe -- now, like, I can get, like,
7  weekends. But during that time we had summer
8  hours. Because we work summer hours down at the
9  Community from the second week of May until after
10  Labor Day. So we're off on Friday.
11  Q. You took a vacation day to vote and go
12  running with your buddy in Valley Green; is that
13  accurate?
14  A. Yes. We was supposed to.
15  Q. Did you vote that morning?
16  A. Yes, I did.
17  Q. What time did this incident happen?
18  A. At the Rite Aid, I would say around --
19  as soon as they opened, because I purchased some
20  eye drops. I would say around 8:00, 8:10.
21  Q. 8:10 in the morning?
22  A. 8:15.
23  Q. Where did you vote?
24  A. Right at the school on Upsal. There is

**Page 19**

1  a school right there on Upsal and Chew.
2  Q. Did you vote regularly or was this the
3  first time?
4  A. I vote regularly.
5  Q. Now, had you been to this Rite Aid store
6  before?
7  A. Yes.
8  Q. How many times?
9  A. Since I been living in the area, you're
10  talking about maybe 15, 20 times.
11  Q. You went there relatively regularly
12  before this incident?
13  A. Yes.
14  Q. Did you get your prescriptions filled at
15  Rite Aid?
16  A. I have before.
17  Q. Do you know any of the employees?
18  A. No. Not by name, just by face.
19  Q. Do you recognize some of them?
20  A. Yes.
21  Q. What was the purpose of going to Rite
22  Aid on the day of this incident?
23  A. I noticed that I wanted some eye drops
24  that they sell by the counter.

**Page 20**

1  Q. Eye drops?
2  A. Yes. Visine eye drops, which is $1.99.
3  Q. Okay.
4  A. And I purchased those. And after I
5  bought those it dawned on me that I wanted some
6  rinsing detergent. Something cheap that don't cost
7  a lot.
8  Q. What kind of detergent?
9  A. Rinsing detergent. In other words,
10  cheap scale of any name brand detergent for, like,
11  $4.95, something like that.
12  Q. Like laundry detergent?
13  A. Laundry detergent.
14  Q. But the word you used was what?
15  A. Rinsing. You just use it to wash your
16  running clothes out until you put them in the
17  regular wash.
18  Q. You were going to buy some cheap
19  detergent?
20  A. Yes.
21  Q. And you had purchased the eye drops
22  before this happened?
23  A. Yes.
24  Q. Do you still have the receipt?

**Page 21**

1  A. No.
2  Q. But you had the eye drops and the
3  receipt on you, correct?
4  A. Yes. Yes.
5  Q. After you bought the eye drops, did you
6  go outside the store?
7  A. No, sir.
8  Q. You bought eye drops and you went back
9  into the store in order to buy something else?
10  A. I was already inside the store, sir.
11  Q. Okay. I understood that. I misspoke.
12  You went back down the aisle to get detergent?
13  A. Yes.
14  Q. How did you pay for the eye drops?
15  A. With cash.
16  Q. Did you buy anything other than eye
17  drops?
18  A. No. No, sir.
19  Q. Did you have a plan to buy eye drops or
20  were you just going in there to see what you
21  needed?
22  A. I had a plan to buy eye drops, which I
23  always get the $1.99 ones.
24  Q. Before you went back to buy the

**Page 22**

1  detergent, did you see anyone you believed was like
2  a security employee?
3     A.  Yes.
4     Q.  Where was that person when you first saw
5  him or her?
6     A.  Okay. When I first saw him, he was in
7  the back of the store.
8     Q.  How was he dressed?
9     A.  Couldn't say. But to be honest with
10 you, all I remember is he had a foreign accent.
11    Q.  Do you remember anything he was wearing?
12    A.  If anything, it was beige.
13    Q.  How do you know he was an employee of
14 Rite Aid? Well, do you believe this person was an
15 employee of Rite Aid?
16    A.  Yes.
17    Q.  What led you to that belief?
18    A.  Because after I purchased eye drops, I
19 wanted some laundry detergent. I picked up the
20 bottle of laundry detergent. One had half --
21    Q.  We're going to get to that. I want to
22 know what led you to believe that this person was
23 an employee of Rite Aid. I asked you if you saw
24 him before the incident?

**Page 23**

1     A.  Yes.
2     Q.  What led you to that belief?
3     A.  Because when he spoke to me, he asked me
4  what I was doing.
5     Q.  But before he spoke to you, did you have
6  any belief, when you first saw that guy, whether he
7  was an employee of Rite Aid or not?
8     A.  No. Not until he spoke to me.
9     Q.  Was he wearing a uniform or anything
10 that identified him as an employee of Rite Aid?
11    A.  No, sir.
12    Q.  Can you describe this person to me in
13 any way?
14    A.  Maybe 5'10", broken accent, maybe
15 Jamaican accent.
16    Q.  What was his race?
17    A.  To me, from what he was talking was like
18 Jamaican.
19    Q.  Dark-skinned?
20    A.  Yes.
21    Q.  You believe he was Jamaican based on his
22 accent?
23    A.  Yes.
24    Q.  Approximate weight? Thin build, medium

**Page 24**

1  build, heavy build?
2     A.  Thin.
3     Q.  Do you remember what he was wearing?
4     A.  I can't say. But I can recall, I know I
5  saw a piece of beige in his clothes.
6     Q.  Some sort of beige in his clothing?
7     A.  Yeah.
8     Q.  Was this person wearing anything that
9  led you to believe he was an employee of Rite Aid?
10    A.  No, sir.
11    Q.  When you first saw that person, what was
12 he doing?
13    A.  When I first saw him, he was asking me
14 what are you doing.
15    Q.  Did you see this person before he
16 approached you?
17    A.  No.
18    Q.  When you went to buy the laundry
19 detergent, was there a specific brand you were
20 looking for?
21    A.  It was some cheap detergent that cost no
22 less than $4.00 and something cents.
23    Q.  Whatever it was, it was cheap?
24    A.  Right.

**Page 25**

1     Q.  That's what you wanted?
2     A.  Right.
3     Q.  Did you find the detergent?
4     A.  Yes.
5     Q.  What happened when you found the
6  detergent?
7     A.  One of the bottles was half full. And I
8  proceeded to shake it. Not dawning on me, because
9  I work with chemicals, me being in housekeeping --
10 it dawned on me. So I looked in the bottle and it
11 was halfway full. So I took another bottle and I
12 poured it into the second bottle.
13    Q.  Let's go back. Why did you do that?
14    A.  It just was an instinct for me to say
15 that I was trying to just fill the bottle instead
16 of taking another bottle.
17    Q.  The bottle you poured it out of, was
18 that a full bottle?
19    A.  It was kind of loose too. It wasn't a
20 whole lot in it.
21    Q.  Is it your testimony that there were two
22 half empty bottles?
23    A.  No. My testimony is one was half full
24 and one was kind of full to the top, but not

**Page 26**

1 completely full.
2     Q. All right. Do you know how when you
3 open detergent up there is, like, a seal you break?
4     A. Yes.
5     Q. Were either of these bottles sealed?
6     A. No.
7     Q. They were both unsealed?
8     A. Unsealed.
9     Q. Were any other bottles in this area with
10 the cheap laundry detergent, were any of them
11 sealed?
12     A. I only picked these two.
13     Q. Is there any reason you just didn't pick
14 a full bottle?
15     A. My mind was -- the reason was that it
16 was unfull (sic), so my thinking was to just pour
17 it into the other one. That's what I did. Not
18 trying to steal it. But when I saw him, he said
19 what are you doing. And I told him. And then he
20 said to me, he started calling me a thief and this
21 and this. So I showed him my money, $200 in cash,
22 my debit Visa card, and I showed him my
23 identification and everything.
24     Q. Let me ask you this. Just so we're

**Page 27**

1 clear, it is your testimony that you transferred
2 some merchandise that was laundry soap from one
3 container into another in the store, correct?
4     A. Yes.
5     Q. Now, the merchandise that you
6 transferred, the two bottles, were they the same
7 brand?
8     A. Yes.
9     Q. What was the brand?
10     A. Called Extra.
11     Q. E-X-T-R-A?
12     A. Yes.
13     Q. They were both Extra laundry detergent?
14     A. Yes.
15     Q. It is your testimony that you poured
16 detergent from one bottle of Extra laundry
17 detergent into another bottle of Extra laundry
18 detergent in the store, correct?
19     A. Yes. Yes.
20     Q. Why did you do that?
21     A. It was half full. It wasn't dawning on
22 me to pick up another one. I said, you know, just
23 pour it in there. When he saw me, I told him I'm
24 not trying to take anything.

**Page 28**

1     Q. So when you grabbed it and it was half
2 full, did you look around for another half full
3 bottle?
4     A. It was just the two sitting there. And
5 then there was some under the bottom.
6     Q. How many bottles were there?
7     A. I can't recall. I would say four, five.
8     Q. And those four or five remaining bottles
9 were all full?
10     A. I didn't never touch those. Just the
11 two that I picked up.
12     Q. So you tried to take one bottle and fill
13 the other one; is that it?
14     A. Yes.
15     Q. When you opened either of the bottles,
16 how did you open them?
17     A. It just opened.
18     Q. A screw top?
19     A. Screw top.
20     Q. You know when you open a screw top,
21 there's like a plastic that kind of separates from
22 a ring, the plastic cap, like on a water bottle?
23 Is there any indication that you broke a seal?
24     A. No.

**Page 29**

1     Q. Was it your intention to buy merchandise
2 that was unsealed?
3     A. It was my indication to buy the
4 merchandise as it was, because it always comes like
5 that unsealed. So I usually buy it that way.
6     Q. It is your testimony that the Extra
7 laundry detergent that you've always bought in the
8 past comes in an unsealed fashion?
9     A. Yes. Yes.
10     Q. And you were just trying to fill it up
11 to the rim, correct?
12     A. Yes.
13     Q. Were you going to pour the merchandise
14 from one bottle to the other in order to fill it to
15 the rim, correct?
16     A. Yes.
17     Q. Someone saw you do this, right?
18     A. Yes.
19     Q. So you agree with me that someone saw
20 you transfer merchandise from one bottle into
21 another bottle?
22     A. Yes.
23     Q. What happened after you tried to
24 transfer merchandise from one bottle to another?

**Page 30**

1   A.   I told him -- I said, I didn't come in
2   here to steal. He said, you come in here all the
3   time and do that. I said, for real, is this a
4   common mistake? I said yes, it is. I said here is
5   my cash. I said, here is my Visa card. This is my
6   identification card. So I said, just let me pay
7   for both of them. That's when he started raging
8   with words after words.
9   Q.   What did he say?
10  A.   You thief, you thief, you this, you
11  that.
12  Q.   He called you a thief?
13  A.   Yes.
14  Q.   What else did he say?
15  A.   You this, you that.
16  Q.   What is the this and that?
17  A.   Just verbally name calling. Nasty
18  names.
19  Q.   What names did he call you?
20  A.   Thief, no good M.F.
21  Q.   What else?
22  A.   He kept saying thief.
23  Q.   Again, do you have any recollection of
24  him calling you anything other than a thief or a no

**Page 31**

1   good M.F.?
2   A.   That's it, pretty much.
3   Q.   When you filled the detergent from one
4   bottle to the other, did you fill it all the way to
5   the brim?
6   A.   No. Just enough for it to be a bottle
7   like you would buy. Because it was half full.
8   Just enough to fill it to be a normal size bottle
9   that you would buy for your normal wash of
10  detergent. Now, when I did do that, he said, like
11  I said before, he said, they always come in here
12  and they do this all the time.
13  Q.   Who said that?
14  A.   This security guy.
15  Q.   His complaint was people have done this
16  before?
17  A.   Have intent to take it. I said, that's
18  not what I came here for.
19  Q.   Is it your belief that the security
20  guard should have somehow known that it was not
21  your intent to steal the detergent when he saw you
22  transferring one bottle into another?
23  A.   I don't know what his belief was until
24  he started calling me names.

**Page 32**

1   Q.   The bottle you were holding and pouring
2   the detergent into, was that the cheapest laundry
3   detergent in the aisle?
4   A.   Yes.
5   Q.   So the person who you believe was a
6   security guard, saw you putting laundry detergent
7   in the cheapest bottle in the aisle?
8   A.   Yes.
9   Q.   Did the person who you believe was a
10  security guard detain you?
11  A.   No.
12  Q.   Did he, in any way, do anything to
13  prevent you from leaving the store?
14  A.   No. Because the only thing he told me
15  when I asked him, I said, sir, here is my Visa,
16  here is money in cash that I have, and I said
17  that's not my intent to come in here and take
18  anything. I said, just let me pay for both of
19  them.
20  Q.   What did he say?
21  A.   He told the girl don't ring me up.
22  Q.   He told you to leave?
23  A.   No. He followed me and he started to
24  call me names again. He had this pole in his.

**Page 33**

1   Q.   He had a pole?
2   A.   Like a metal thing they pull down the
3   gate at night with. So I walked on out. And then
4   he kept saying, your mother is a B-I-T-C-H. He
5   wanted to fight. He was provoking me.
6   Q.   He followed you out of the store?
7   A.   Yes.
8   Q.   At any point in time, did the security
9   guard prevent you from leaving the store?
10  A.   No.
11  Q.   He wanted you out of the store?
12  A.   He told her, don't ring me up. So I
13  went out of the store. He didn't say that. But he
14  came behind me after I walked out of the store with
15  this pole. It was a metal rod that you pull down
16  the gate with at night.
17  Q.   Did he threaten you with the pole?
18  A.   Yep.
19  Q.   How did he threaten you with the pole?
20  A.   He told me what he would do to me.
21  Q.   What did he say?
22  A.   He said you B-I-T-C-H and, you know, he
23  said hit me, hit me. After he called my mother a
24  B-I-T-C-H, I did drop my bag. But I dropped my bag

**Page 34**

because my mother is deceased and I was angry. But something came over me and told me it's not worth it. So he kept saying, your mother is a full dead B-I-T-C-H. And then my mother was going through my head and I said, no, I'm not going to touch him. He was looking for a fight and then I'm going to jail. So he stayed out there for a while, hit me, hit me, hit me.

Q. You're saying that he was telling you to hit him?
A. Yeah. You B, you hit me.
Q. He never laid hands on you?
A. He wanted me to.
Q. He never laid hands on you?
A. No.
Q. He was saying for you to hit him?
A. Yeah.
Q. What happened next?
A. He kept threatening me with the rod.
Q. How did he threaten you with the rod?
A. Cocked it back. Because he could tell by my reaction that I didn't like what he was saying to me about my parent. And then I told him, you don't know my mother. I said, man, my mother

**Page 35**

died from Lupus. Then I said --
Q. Your mother died from Lupus?
A. Yes.
Q. Go ahead.
A. And I told him, I said look, I said, I was not trying -- I'm not trying to take anything or doing no harm to you. You're telling me to hit you. Is that what you want me to do? I said, I'm calling 911.
Q. You called the police?
A. Yes, I did.
Q. Now, when you called the police, what happened then?
A. When I called 911, I told them exactly the same thing I told you. They told me to stay on the phone. And he went over it with me again. And he said someone would be on their way. And I stood outside the store. He at that time had gone back in, still holding that same stick, looking outside the window gazing at me.
Q. Did the police come?
A. Yes.
Q. What happened when the police came?
A. She walked me -- I was trying to explain

**Page 36**

to her what happened. But she said, come on back in the store now. So when I went back in the store, I had a book bag. I had a towel, two shirts, cocoa butter and a pair of sneaks.
Q. Because you were going to go running?
A. Yes.
Q. Where were you going to shower after you ran?
A. After I ran?
Q. Yes. Where were you going to shower?
A. Go back home.
Q. Why were you carrying all that stuff with you if you were going to go home?
A. Because a towel and a shirt -- you can wash up there at Valley Green in the sink there. But the bathroom is filthy. The towel is for me to put on the back of my friend's chair to keep from sweating in it. Also for wiping my face when I'm done.
Q. Okay. Go ahead. She takes you back in the sore?
A. She told me to come back in the store. I tried to explain to her before we got into the store what was occurring. She said she didn't want

**Page 37**

to hear that at all.
Q. Do you know the police officer's name?
A. Yes. I think Matthew gave it to me. I think her name is on one of my subpoenas. Lauren Oswald.
Q. Do you know the name of the person who you believe was the security guard?
A. No, I do not.
Q. Did you ever learn that name?
A. No.
Q. So you go back into the store with Officer Oswald. What happens then?
A. Okay. I was still trying to talk. She said shut up. So she said let him talk. So he gave her the version of what happened.
Q. What did he say?
A. He said I came in there to take stuff. And he said this and that. And he said I put stuff in the bag and he seen people do it all the time. And I said, no, that's not --
Q. What did he say to the officer that was not true?
A. This is what he stated. He said, I see people come in the store all the time trying to

**Page 38**

1   come in here and take things. And then he said, he
2   came in here doing this and that. I don't remember
3   all of it.
4       Q.   Do you remember what he told Officer
5   Oswald, other than he has seen people trying to
6   take stuff from the store?
7       A.   Yes. Then she asked him, she said, what
8   do you want to do about this? She said, do you
9   want to press charges?
10      Q.   What did he say?
11      A.   He said yes. She told me to drop my bag
12  and turn around.
13      Q.   Okay. At that point, this is the first
14  time you were detained, correct?
15      A.   Yes.
16      Q.   And the first time you were detained was
17  by the Officer of the City of Philadelphia,
18  correct?
19      A.   Yes.
20      Q.   And it's your testimony that you were
21  never detained at any point in time in this case by
22  anyone who you believe was employed by Rite Aid; is
23  that accurate?
24      A.   That's accurate.

**Page 39**

1       Q.   What happens then?
2       A.   She told me to turn around and drop my
3   bag. I turned around. I dropped my bag. And then
4   she cuffed me. She told me -- she never read me my
5   Miranda rights. She never said you have the right
6   to remain silent. She never said to me -- she told
7   me, you're going down to the 35th and talk to the
8   detective and you can explain it down there.
9       Q.   She took you down to the 35th?
10      A.   Yes.
11      Q.   Let's go back a little bit. I want to
12  know everything that you heard the person who you
13  believe was a security guard from Rite Aid tell the
14  police officer. You told me that he said that
15  these people try to take stuff all the time,
16  correct?
17      A.   Yes.
18      Q.   What did the person who you believe was
19  a security officer tell the police officer that you
20  did?
21      A.   He said he assumed that I was trying to
22  take something from the store. But we had talked
23  in advance before the police officer got there.
24  Because, like I said, I showed him my cash. I

**Page 40**

1   showed him my debit card. And I told him, I don't
2   have time for this.
3       Q.   He did see you transferring merchandise
4   into another package, right?
5       A.   Yes. Yes. So I told him, that was not
6   my intention to come in here and take anything. I
7   said here I am -- so when we got back in the store,
8   she let him go ahead and say what he had to say.
9   He told her, they come in here all the time doing
10  this. I don't know who they is.
11      Q.   Did she ask to look at the soap bottles?
12      A.   No.
13      Q.   Did this person who you believed to be a
14  security officer show her the soap bottles?
15      A.   No.
16      Q.   She said, do you want to press charges
17  and he said yes, and she took you down to the
18  police station, correct?
19      A.   Yes. I was supposed to talk to a
20  detective.
21      Q.   Was the police officer alone or did she
22  have a partner?
23      A.   When Lauren came up, she was alone.
24      Q.   Lauren?

**Page 41**

1       A.   Yes.
2       Q.   Is that Police Officer Oswald?
3       A.   Yes.
4       Q.   Lauren Oswald was her name?
5       A.   Yes.
6       Q.   Can you describe Lauren Oswald for me?
7       A.   From that day, I'll just say blond hair,
8   blue eyes. I can't say how tall. But maybe 5' --
9       Q.   What was her race?
10      A.   She was white.
11      Q.   Anything else about her?
12      A.   I mean, she was kind of like real, you
13  know, real harsh with me. Because, I mean, like, I
14  don't feel like she heard me out at all when I was
15  at Rite Aid at all. She didn't give me a chance to
16  explain my side of the story.
17      Q.   What is your side of the story?
18      A.   That I didn't come there to steal, first
19  of all. Second of all, the thing is though, is
20  that the name calling, and then with the stick for
21  him coming outside, and then verbally calling me
22  these names inside the store, outside the store,
23  was me about my character and then also about my
24  mother.

**Page 42**

Q. When he was calling you names, is there anyone you can tell me that heard him say these things about you?

A. It was just me and him outside.

Q. Are you aware of anyone who heard this person who you believe was a security officer call you a thief?

A. I can't say, because it was other people in the store.

Q. Did you know those people?

A. No.

Q. You don't know their names?

A. No.

Q. Have you ever seen any of these people since this incident?

A. No.

Q. You were telling me your side of the story and I cut you off. What is your side of the story?

A. Well, I mean, for instance, he could have let me pay for that, you know. Then again, I bought the eye drops. He seen that I had $200 in cash and I had a Visa card. Then I was trying to explain to him. I said, if I'm wrong for pouring,

**Page 43**

I said, it's poor judgment. And here I am, I said, I want to do the right thing. He just got overly, overly just, like, raging mad. He said, well, you this and that, you this and that. I said, man, please. All I'm trying to do -- and then I proceeded to walk both of the bottles up to the cashier. He tells her, don't ring him up at all. So I left them. I said it's no more discussion about it, you know.

That's when he followed me out of the store. I bought the eye drops. So I said okay. I said, you know. Then I saw him with the stick. I wasn't even going to call the cops. I said to myself, I said, look, this is going too far. You done calling me name after name, verbally abusing me. He's calling my mother a B-I-T-C-H. He don't know her. He's making me feel degraded, because my mom I did love. So I stayed on the phone with the dispatcher. I told them what was happening. I told them where I was at.

They asked me which Rite Aid, and I told them at Upsal and Stenton. They told me, where are you now? I said outside the store. And I told them what was happening. They told me stay

**Page 44**

right there and the officer would be on the way.

Q. The officer was this Oswald, who ended up locking you up, right?

A. Yes. And then a couple other officers came, too, but I don't remember what they looked like. But I remember that they were with her. They came.

Q. Now, what happened when you got to the police station?

A. When I got to the police station, she seems to be, like, raging, like a lot of rage in her, like a lot of hate in her. So I was cuffed behind my back. And I asked her, I said, where is the detective I was supposed to be talking to? Sit down. So I said, Miss -- because, you know, I'm not a person that has gone to jail repeatedly or been in trouble repeatedly. So right now I'm thinking about my job and this, and I'm down here. And I'm thinking about my buddy waiting for me. He don't know what's happening because she took the battery out of my phone. So I couldn't call anyway. She said, sit down. So I said, I thought you said I was going to talk to a detective.

From there they booked me or

**Page 45**

whatever they did. They put me in jail. I was in jail from, like, 9:00 until, like, 2:00 or a little after 2:00 in the morning. Never talked to a detective. She never read me my rights. She never told me to sit down and talk to a detective. And when the charges came up, all the charges that was on there, it was outrageous. I couldn't believe it.

Q. You were kept in the jail until when?

A. From 9:00 to about 2:00 a.m. in the morning.

Q. Did you have to retain criminal counsel?

A. Yes. I went and got a public defender. The next day I called out. Because, you know, my job was strict about, you know -- I called out. I went down to the public defender's office, told them my side of the story. And they told me, well, your first court date would be April 28th. I went up there to the 35th District at that time. They said the Commonwealth was not ready to try it because the guy didn't show up, no one from Rite Aid showed up. I went back again in May. I went back again at least three or four times. October 16th, that's when they dismissed the charges, the

Page 46

1  lady judge.
2     Q. After you had been there a number of
3  times?
4     A. Yes. I lost a lot of my vacation time.
5  I lost a lot of my personal time. I lost a lot of
6  my sick time.
7     Q. You allege in your Complaint that you
8  believe that these actions were taken due to your
9  race. Why do you believe that?
10    A. Because she was --
11    Q. I'm talking about Rite Aid. I'm
12 limiting my question to Rite Aid. You write in
13 your Complaint that the actions that Rite Aid took
14 that day were due to your race. Why do you believe
15 that?
16    A. Because I felt like if -- it shouldn't
17 even have went that far. This could have been
18 worked out at the store. It could have been worked
19 out at the store. I wasn't trying to steal. I
20 didn't try to walk out of the door with anything.
21 I didn't walk out the door with the eye drops.
22    Q. Do you agree that the first time the
23 security officer confronted you is when you were
24 pouring merchandise into another conditioner; is

Page 47

1  that accurate?
2     A. Yes.
3     Q. Why do you believe that the security
4  officer didn't have at least a concern that you
5  were trying to take merchandise?
6     A. It was a hate there. I could tell.
7     Q. Well, I understand that. But why would
8  he not think that you weren't trying to steal
9  stuff?
10    A. Because I showed him my cash and I asked
11 him to pay for this.
12    Q. That was after you were confronted?
13    A. Yes. And I asked him.
14    Q. When he first saw you, how was he
15 supposed to know you're not trying to steal
16 something?
17    A. I look at it, well to me, I wasn't
18 trying to take it.
19    Q. How does he know that?
20    A. Because I told him.
21    Q. Okay. Why do you believe his actions
22 were due to race?
23    A. Because the people who probably been in
24 there before, you know -- I don't know. I don't

Page 48

1  know what occurred before when anyone else came in
2  there.
3     Q. I want you to tell me everything that
4  happened to lead you to conclude that the reason
5  the people from Rite Aid acted the way they did was
6  because of your race?
7     A. For one, I had on a pair of cut off
8  pants, tennis shoes, back pack on my back, with
9  another two changes of shirt, a towel, cocoa
10 butter, and two shirts. They think probably, well,
11 this guy is homeless or he is this or he is that.
12 I couldn't say. But just the idea, my main theory
13 is that when I came in there and whatever occurred,
14 I just thought maybe I was singled out. I don't
15 know. I was singled out. I don't know. But by me
16 being locked up, really, that was out of character,
17 because she never let me say anything.
18    Q. Again, I'm concerned about Rite Aid.
19 Can you tell me anything Rite Aid did or any
20 employee of Rite Aid did that leads you to the
21 conclusion that their actions were based on your
22 race?
23    A. I believe that they thought everyone who
24 comes in there is going to steal.

Page 49

1     Q. What is that, again?
2     A. I said, I believe that everyone he
3  thinks that comes in there that day or any other
4  day will steal something.
5     Q. And how is that based on your race?
6  That's what I want to know. What leads you to that
7  conclusion? What made you put this in the
8  Complaint that Ride Aid's actions were based on
9  race?
10    A. Because I feel that as a black man, he
11 is stigmatized of that kind of character. But I
12 feel that it was some hate there. I don't know if
13 it could be considered initiated to be color. But
14 I feel that it was wrong. I don't know.
15    Q. I understand that you feel it was
16 wrong. But do you have any knowledge as to whether
17 it was race related?
18    A. Yes.
19    Q. Why do you think it was race related?
20    A. One is being the way I was dressed.
21 Secondly, is because of the demeanor with him
22 talking.
23    Q. Demeanor and dress. Anything else?
24    A. And I really felt that he thinks that

Page 50

1   because I was black that I would steal.
2      Q.   Why do you believe that?
3      A.   Because he should have gave me a chance
4   to tell my side of the story when the police
5   officer came up. He didn't do it. I asked him
6   to. I asked her. I said, since he said what he
7   said, can I tell you my side of the story? She
8   said, drop the bag and turn around. And she asked
9   him, what do you want to do about this?
10     Q.   Let me go back. No one at Rite Aid ever
11  detained you, correct?
12     A.   No.
13     Q.   And no one from Rite Aid called the
14  police, did they?
15     A.   No.
16     Q.   You called the police?
17     A.   Yes.
18     Q.   No one from Rite Aid arrested you,
19  correct?
20     A.   No, sir.
21     Q.   That was the police, right?
22     A.   Yes.
23     Q.   No one from Rite Aid ever showed up at
24  court, correct?

Page 51

1      A.   Yes. No, they didn't.
2      Q.   No one from Rite Aid ever came into
3   court and gave false testimony, correct?
4      A.   That's correct.
5      Q.   You believe that the people at Rite Aid
6   asked you to leave the store after they saw you
7   transferring merchandise from one package to the
8   other, correct?
9      A.   No. He wouldn't let me pay for it. So
10  then again, he said don't ring me up, so I left.
11     Q.   Your testimony is that people who you
12  believe worked for Rite Aid saw you transferring
13  merchandise from one package to the other, correct?
14     A.   The one guy.
15     Q.   Yes. Right?
16     A.   Yes.
17     Q.   And then they would not let you purchase
18  the merchandise that you transferred one package to
19  another, correct?
20     A.   Right.
21     Q.   And then you left on your own?
22     A.   Yes.
23     Q.   So your testimony is that no one from
24  Rite Aid ever asked you to leave the store?

Page 52

1      A.   No.
2      Q.   What exactly did Rite Aid do wrong?
3      A.   What did they do wrong?
4      Q.   Right.
5      A.   He should have told the officer, look, I
6   -- I think he should have heard my side and she
7   should have listened. Second of all, I think when
8   I walked outside the store, him calling someone
9   name words over and over repeatedly.
10     Q.   The thief word?
11     A.   B-I-T-C-H and a bastard.
12     Q.   Did he ever call you any racial slurs?
13  Did anybody?
14     A.   I don't know for sure. But I know he
15  called me a lot of names.
16     Q.   You can't remember any racial slurs?
17     A.   He used the N word.
18     Q.   Okay. When did that happen?
19     A.   Outside the store.
20     Q.   What did he say exactly?
21     A.   All you niggers are the same. Come in
22  and do that and think you can get over. I said,
23  man, that's not even my character.
24     Q.   That was after you voluntarily left the

Page 53

1   store?
2      A.   Yes. Because he followed me out.
3      Q.   Did anyone hear him say that?
4      A.   It was only me and him in the parking
5   lot.
6      Q.   Is there anyone you can tell me that
7   heard someone from Rite Aid use that language?
8      A.   Outside in the parking lot it was only
9   me and him.
10     Q.   Okay.
11     A.   But inside the store when I was trying
12  to pay for it, he was using words. So someone had
13  to hear him saying something.
14     Q.   Your testimony now is that he was also
15  using the N word inside the store?
16     A.   Bastard. He was telling me, you know,
17  they come in here doing it all the time.
18     Q.   How many times did the person you
19  believe worked for Rite Aid use racial slurs?
20     A.   Called me a bastard, called me the N
21  word, called me thief. Thief so many times.
22     Q.   He called you bastard, he called you
23  thief, correct?
24     A.   Yes.

Case 2:09-cv-04826-BMS   Document 17-1   Filed 09/29/10   Page 16 of 19

EARL WILLIAMS

**Page 54**

1  Q. Then he called you B-I-T-C-H, correct?
2  A. Yes. That was outside.
3  Q. And did he call you any racial slurs
4  other than the N word?
5  A. That's it.
6  Q. Are you aware of anyone who heard him
7  use that word, other than you?
8  A. I'm not sure. On the outside no one
9  could hear him, because it was only me and him out
10 there. Other people was in the store when we first
11 had a confrontation.
12 Q. All right. Did you have to pay for your
13 lawyer?
14 A. The gentleman told me when I go up for
15 it that it could have been worked out at the
16 store. He said this don't make no sense.
17 Q. My question is, did you have to pay for
18 your lawyer?
19 A. No. I went and got a public defender,
20 which he recommended me to do.
21 Q. How much time did you miss from work?
22 A. I missed the following day and just
23 going up there pretty much a good six months. I
24 mean, I went up there for six months from April to

**Page 55**

1  the end of October.
2  Q. You worked during that time frame,
3  correct?
4  A. Yes.
5  Q. It wasn't like you missed six months of
6  work, right?
7  A. I worked, but I had to schedule off to
8  cover those appointments.
9  Q. Correct. How many days did you miss
10 from work because of this incident?
11 A. Maybe talking about 12, 13 times.
12 Q. 13 days from work?
13 A. Yes.
14 Q. Did you miss income because of that or
15 did you have to take sick time and vacation time?
16 A. Yes. I was taking sick time and
17 vacation and personal time.
18 Q. You didn't miss any income because of
19 the time you missed?
20 A. Yeah. I mean, if I didn't have the
21 personal and sick time, I would have missed time.
22 Q. Okay. My question is, did you lose any
23 income because of this incident?
24 A. Sometimes I was real nervous and

**Page 56**

1  couldn't sleep at night, so I wasn't working.
2  Q. How much income did you lose because of
3  this incident?
4  A. I can't say precise.
5  Q. Did you seek any medical treatment
6  because of this incident?
7  A. No.
8  Q. No medical treatment. You can't tell me
9  what wages you lost because of this incident; is
10 that correct?
11 A. Because I was using my vacation and sick
12 time.
13 Q. I understand. Does that accrue over the
14 years or do you have to use it every year?
15 A. It accrues every month. Your vacation
16 accrues every month. Personal you get at the first
17 of the year. Sick time accrues once every year.
18 Q. Did you ever give any testimony in court
19 because of this incident?
20 A. I couldn't sleep at night.
21 Q. Did you give any testimony in court
22 because of this incident?
23 A. At the pre-trial?
24 Q. Anywhere before this, any testimony in

**Page 57**

1  court.
2  A. No. Because no one ever went that far.
3  Q. You couldn't sleep at night for how
4  long?
5  A. Until this really got thrown out and
6  then I could obtain Mr. Matthew Weisberg.
7  Q. Have you sought any medical treatment
8  because of your lack of sleeping?
9  A. Yeah.
10 Q. Who did you go see?
11 A. I mean, Dr. Foreman used to be at --
12 no.
13 Q. What is his name?
14 A. Foreman.
15 Q. F-O-R-E-M-A-N?
16 A. Yes.
17 Q. What is Dr. Foreman's first name?
18 A. Lawrence.
19 Q. Where is Dr. Lawrence Foreman's office?
20 A. 77-7400 Ogontz (sic). It's called
21 Medical Center at Ogontz.
22 Q. In Philadelphia?
23 A. Yes. But prior to that I had sleeping
24 problems before this occurred. It just

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

Page 58

1 accumulated, to be truthful with you.
2 Q. So you had sleeping problems before this
3 incident, but this made it worse?
4 A. Made it worse.
5 Q. Did you treat with Dr. Lawrence Foreman
6 for your sleeping problems before this incident?
7 A. Yes.
8 Q. Did you have health insurance at the
9 time of this incident?
10 A. Yes, I did.
11 Q. Who is your health insurance with?
12 A. Blue Cross/Blue Shield.
13 Q. Have you incurred any medical bills
14 because of this incident?
15 A. No.
16 Q. What other doctors were you treating
17 with on a regular basis before this incident, other
18 than Dr. Lawrence Foreman?
19 A. Dr. Foreman.
20 Q. No other doctors?
21 A. Because in 2005 I had a light stroke.
22 Q. You had a light stroke?
23 A. Yeah.
24 Q. Did Dr. Foreman treat you for that?

Page 59

1 A. His son. His son.
2 Q. Did they practice together?
3 A. No.
4 Q. Where is his son's office?
5 A. He -- well, when I went in the hospital
6 at Chestnut Hill, I had a light stroke. That's how
7 I met him. But I didn't -- I don't know where his
8 office is at. He treated me for the stroke.
9 Q. How long were you treated at Chestnut
10 Hill Hospital for?
11 A. Eight, nine days.
12 Q. Is there any other health care provider
13 who you were seeing on a regular basis before this
14 incident, other than Dr. Foreman?
15 A. No.
16 Q. Is there any health care provider you
17 saw after this incident, other than Dr. Foreman,
18 for any reason?
19 A. Just Dr. Foreman.
20 Q. You're not claiming any personal injury
21 because of this incident, like injury to your body?
22 A. No. He never hit me with that pole. He
23 just threatened me. He never hit me at all.
24 Q. What name did you call the guy from Rite

Page 60

1 Aid?
2 A. What name?
3 Q. What did you call him? Did you call him
4 any names? Did you argue with him? Did you yell
5 at him?
6 A. No. I argued with him after he told me
7 about my mother four or five times. I told him,
8 you don't know my mother. I said, guess what, I'm
9 calling the cops. He said, you hit me you
10 B-I-T-C-H, you hit me. He was trying to provoke me
11 to get a worse scenario than I already was supposed
12 to be in. I didn't do that.
13 Q. He didn't touch you, right?
14 A. No. He drilled back at me to hit me,
15 but he never hit me.
16 Q. So we're clear, no one at Rite Aid ever
17 had any physical contact with you, correct?
18 A. No. No.
19 Q. Is that correct?
20 A. That's correct.
21 Q. No one at Rite Aid ever in any way
22 detained you, correct?
23 A. No.
24 Q. Is that correct?

Page 61

1 A. That's correct.
2 Q. No one from Rite Aid ever asked you to
3 leave the store; is that correct?
4 A. No.
5 Q. You left the store on your own, right?
6 A. Yes.
7 Q. No one at Rite Aid ever testified
8 against you in court; is that correct?
9 A. That's correct.
10 Q. When the police officer came to the
11 scene, what did the person at Rite Aid say
12 happened?
13 A. He came in here -- he was telling her --
14 first I was trying to explain, because I was kind
15 of emotional. She said, shut up. Let him tell his
16 side. So I just shut up. Then he said, he came in
17 here -- and I didn't hear because he speaks with
18 broken English. So I didn't understand exactly all
19 what he was saying. And then all I know -- so I
20 tried to rebut and tried to say what I had done or
21 what was taking place. She told me to shut up. So
22 she said, what do you want to do about this.
23 Q. You can't tell me what the person from
24 Rite Aid told the police officer, can you?

**Page 62**

1    A.   I can tell you that when she asked him
2 do you want to press charges, he said yes.
3    Q.   Other than that, when she asked what
4 happened, what did he say happened?
5    A.   I can't recall to tell you.
6    Q.   Okay. You can't recall what anyone from
7 Rite Aid said to the police at any time, can you?
8    A.   No. Besides just the only thing he said
9 was people come in here and do it all the time. I
10 don't know.
11    Q.   You say after hearing the guard's
12 version of events, Oswald told plaintiff to drop
13 his bag and turn around. This is in your
14 Complaint. What was the guard's version of events
15 that you heard?
16    A.   When she asked him his side of the
17 story, whatever he was telling her. Do you want to
18 press charges.
19    Q.   Were you right there when he said it?
20    A.   Yes.
21    Q.   What was his version of events?
22    A.   He said, they come in here all the time
23 and do what they want to do. He said, he came in.
24 That's what I supposedly heard. Then she asked

**Page 63**

1 him, what do you want to do about the situation?
2 Then she said, do you want to press charges? She
3 wasn't -- it wasn't even in a conversation more
4 than a minute before she asked, do you want to
5 press charges. So she said drop the bag. And I
6 did. And turn around. She never said, you have a
7 right to remain silent. She never read me my
8 Miranda rights. She never said anything. All she
9 said was you're going downtown to talk to a
10 detective.
11    Q.   Did you ever purchase Extra laundry
12 detergent before at any place?
13    A.   Sure.
14    Q.   How has this incident affected your
15 life?
16    A.   I have a record now. I mean, if I want
17 to go apply for U of Penn -- you know, Community is
18 not my last place of employment.
19    Q.   Why do you think you have a record?
20    A.   Well, when someone arrests you and puts
21 eight charges on you that's false and not true --
22 and I wasn't convicted of any of them.
23    Q.   So the arrest record, you're concerned
24 about?

**Page 64**

1    A.   I'm concerned -- the arrest record I'm
2 worrying about. Also the damage between the part
3 of me going to be put in jail, going back and forth
4 to court numerous times, where I could be doing
5 other things. I could save up for me going to see
6 my father and my people in South Carolina. I mean,
7 I lost some time. And to me, I think it was very
8 -- it hurts. It took a lot out of me.
9    Q.   Did you ever see Rite Aid do anything to
10 assist the police in prosecution of this case?
11    A.   No. Besides telling their side of the
12 story.
13    Q.   And you were present for that; you also
14 told your side at the scene?
15    A.   No.
16    Q.   They didn't ask you?
17    A.   She didn't let me. She didn't let me.
18    Q.   Okay.
19    A.   Just what he said. She said, you're
20 going downtown to talk to the detective.
21        MR. EVANS:   Do you have any
22    questions?
23        MR. BAIRD:   No.
24        MR. EVANS:   We're done.

**Page 65**

1            (Witness excused.)
2    (Deposition concluded at 2:35 p.m.)

```
                                                    66
 1               CERTIFICATION
 2
 3
 4
 5        I, MARY E. BRIEN, Registered
 6   Professional Reporter and Notary Public, do hereby
 7   certify that the foregoing is a true and accurate
 8   transcript of the stenographic notes taken by me in
 9   the aforementioned matter.
10
11                    - - -
12
13
14
15
16
17
18        DATE:
19
20        _____
21        Mary E. Brien
22        Registered Professional Reporter
23
24
```